# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

EARL L. CLOSSON,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

       Defendant.

No. C06-4095-MWB

**REPORT AND RECOMMENDATION**

---

## I. INTRODUCTION

The plaintiff Earl L. Closson seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Closson claims the ALJ erred in (1) failing to find him presumptively disabled under Listing § 12.05C for mild mental retardation; (2) failing to find him disabled under Vocational Rule 201.17; (3) failing to give "good reasons" for discounting the opinions of his treating physicians; and (4) failing to ascertain whether there were inconsistencies between the vocational expert's testimony and the Dictionary of Occupational Titles. (*See* Doc. Nos. 11 & 15) The Commissioner responds by claiming Closson had a fair hearing and full administrative consideration in accordance with the applicable statutes and regulations, and substantial evidence on the record as a whole supports the Commissioner's decision. (*See* Doc. No. 14)

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA"). On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he was substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d)(1).

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On July 31, 2003, Closson filed applications for DI and SSI benefits, alleging a disability onset date of May 23, 2003. (R. 53-55; 292-94) Closson claims he is disabled as a result of "[s]pasticity due to spinal cord injury," which causes him to have an abnormal gait, balance problems, numbness in both hands and fingers that prevents him from grasping things well, and difficulty walking any distance. (*See* R. 78, 101) Closson's applications were denied initially and on reconsideration. Closson requested a hearing, and a hearing was held on September 14, 2005, before Administrative Law Judge ("ALJ") John P. Johnson. (R. 309-74) Closson was represented at the hearing by attorney Dennis M. McElwain. Closson testified at the hearing, as did Vocational Expert ("VE") George Paprocki. In addition, Dena Wise, from whom Closson rented a room, testified at the hearing. On March 20, 2006, the ALJ ruled that although Closson cannot return to his past relevant work, he retains the residual functional capacity to perform other work that exists in significant numbers in the national economy. He therefore denied Closson's applications for benefits. (R. 15-23) Closson appealed the ALJ's ruling and on August 30, 2006, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-9)

Closson filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Closson filed a brief supporting his claim on May 9, 2007. (Doc. No. 11) The Commissioner filed a responsive brief on July 12, 2007. (Doc. No. 14) Closson filed a reply brief on July 23, 2007. (Doc. No. 15) The matter is now fully

submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Closson's claim for benefits.

## B.  Factual Background

### 1.  Introductory facts and hearing testimony

Closson was born in 1959.  He alleges he became disabled on May 23, 2003.  At the time of the ALJ hearing, he was 5'11" tall, weighed 221 pounds, and was 46 years old. (R. 314, 342)  In the past, he has weighed as much as 250 pounds, but he lost weight after he was diagnosed with diabetes in 2001.  (R. 342, 349)  He was legally separated. (R. 342)  He holds an unrestricted driver's license, and drives about five miles a week. *Id*.  He can add and subtract using scratch paper or a calculator.  (R. 343-44)

Closson was born and raised in Sioux City, Iowa.  After about third grade, he was placed in special education classes.  He remained in special education through high school, but he never was able to learn to read or write.  After high school, he received training in auto mechanics from a vocational rehabilitation expert, but he was unable to graduate from the program because it involved math and reading beyond his abilities, and he was unable to get his boiler license.  (R. 314-18)

Closson took classes at a community college that helped him get a job as a janitor at St. Luke's Hospital, where he worked from about 1979 to 1984.  He held a series of miscellaneous janitorial jobs throughout the 1980s and the early 1990s.  In about 1994, he began work at a company that bottles and sells soda.  (R. 320-23)  He operated a machine that moved bottles from pallets to conveyor belts.  (R. 344)  He worked at this job for three years, and then he was laid off.  He next worked at a computer company.  For the first year, he worked in an assembly position, but when the job duties changed, he could not keep up, so he went into maintenance.  He worked there for about three-and-a-half years.  He next held temporary jobs, first at the computer company, booting up computers,

and then at a dog food company, tearing down displays and repackaging them. (R. 323-28)

In 2002, Closson began working as a machine operator for American Popcorn Company in Sioux City. (R. 328) His job was to watch the machinery and un-jam it when necessary. This job required him to lift fifteen-pound bundles routinely, and eighty-pound bags occasionally. (R. 345-46) The job involved a lot of bending and twisting. (R. 328) He was laid off from that job when his shift was cut. (R. 329)

Closson's last employment was with the City of Sioux City, where he operated an industrial-sized "weed eater," cutting down weeds in public areas. The weed eater weighed about twenty pounds. The job involved bending and stooping. While still a probationary employee, he injured his neck. (R. 329-30) Before his injury, he had no physical problems doing this job. (R. 348) After his injury, his legs tingled all the time, and he could hardly walk. His legs felt "rubbery." When he did walk, he would waddle because his legs were not "working right." (R. 330)

He first was treated for the injury at Siouxland Community Health, where he was referred to neurologist Thomas Clark. Dr. Clark planned to refer Closson to the University of Iowa Hospital, but Closson's condition worsened, and he underwent back fusion surgery in Sioux City. The surgery was performed by Dr. Durward, a neurosurgeon. In the fall of 2003, Closson had physical therapy to help with his balance and to re-strengthen his legs. He also took speech therapy for his vocal cords, because his voice "kept going in and out from the surgery," although by the time of the ALJ hearing, his speech problems had cleared up. However, his legs and his balance continued to be a problem. R. 331-33. He testified,

> Well I can't stoop for very long. If I do my legs start going berserk. I can't bend over. If I extend myself too much, I'll lose my balance, and have to catch myself. I – if I sit very long I will get up and walk with a limp and kind of hobble. And I can only move my – I can only turn my neck this far –

4

so far. I can't put my chin on my chest any more like I used
to.

(R. 333)

After the surgery, there was no employment available for Closson with the City, so
he lost his job. He filed a Worker's Compensation claim for this injury, but the claim was
denied initially, and was pending at the time of the ALJ hearing. (R. 333-34)

After the surgery, Dr. Durward recommended no further treatment, but he advised
Closson he would no longer be able to do any kind of hard labor because of the risk that
he would wear out his neck and re-injure himself. (R. 334)

Since the surgery, Closson has had problems with the range of motion in his neck.
If he attempts to look up or moves his neck from side to side, he feels tension in his neck.
If he looks down, he feels pressure in the back of his neck. He also has had emotional
problems. When he found out he was going to have neck surgery, he "broke down
crying." (R. 334-35)

Closson testified he cannot go back to any of the jobs he has performed in the past.
(R. 336) When asked if the consulting physician Dr. Weis was correct in his conclusion
that Closson can lift twenty pounds occasionally, Closson responded, "The way I
understand that I'd wear my neck out, the rest of my neck, the rest of the vertebras in my
neck I'd wear out if I did that." (R. 336-37) Closson also disputed Dr. Weis's conclusion
that he has an unlimited capacity to push and pull, stating he cannot do that because it
would strain his neck and wear it out. (R. 337)

Closson has known Dena Wise since about 2000 or 2001. Wise owns her own
home, and Closson rents a room from her, although he owes her back rent. (R. 337-38)
He moved in with her as a renter before 2003, when he injured his neck and had surgery.
(R. 359) He does some of the simple housework, such as doing the dishes and vacuuming,
although he has to rest afterwards. For example, after he does the dishes, he will have to
sit down and rest, and he just wants to go to sleep. (R. 337-39) He is unable to do any

of the laundry because the laundry room is in the basement, and he has "a heck of a time getting up and down the steps." (R. 338) He does none of the yard work or snow removal. (R. 339) Wise has noticed that Closson's mental abilities have deteriorated since his injury. She works on a crew at a Hardee's restaurant, and in her opinion, Closson would not be able to do her job because of his mental problems. (R. 459-60)

Closson testified he is not getting any better, but he is not getting any worse, although he would be worse if he went back to work. After sitting for twenty minutes, his legs become uncomfortable and start to quiver, as they did during his testimony at the ALJ hearing. (R. 339-40) He can stand and move around to help with this problem, but after about forty minutes, he has to sit down again. (R. 351) His legs get tired if he stands for too long. He can walk four or five blocks, and then his legs are tired. (R. 340, 351) When he walks, he has to be careful where he steps so that he does not trip. If he squats, his "legs start going," and he has "jiggling" in the nerves in his legs. (R. 351-52) He cannot stand to be out in the cold for too long or his legs will be tingly and start quivering. (R. 355) He also has problems kneeling, crawling, pushing, and pulling, because these activities cause him to strain his neck or back. (R. 352, 354) He has restricted range of motion of his neck, but he has no problems using his hands or with his grip, with the exception of small screws, which he always has had a problem handling. He has no problem operating hand or foot controls when driving. He has a problem keeping his mind on things and is distracted easily. He has no problems getting along with coworkers, his family, or acquaintances. Stress makes him tired, and he is stressed by not being able to work, not having money, and not being able to do the things he used to do. (R. 353-55)

Although he likes to work on cars, he has not been able to do so since his injury. He is unable to work under the car, or even to change the oil. He has had no type of retraining or refresher courses. He does not read the newspapers because of his limited attention span. He has no problems with his short-term memory. (R. 340-41)

Closson testified he sees Dr. Durward about once a year for a checkup, and he last saw him in March 2005. He saw Dr. Clark in April 2005, in connection with his Worker's Compensation claim and Social Security claim, but otherwise he does not see Dr. Clark for treatment. He sees Dr. Danner of Siouxland Community Health about once every six months for a medication check. He takes Glucophage for diabetes, Lipitor for cholesterol, and an aspirin a day to "keep [his] blood flowing a lot easier." (R. 348-50)

On a typical day, Closson goes to bed between 10:00 p.m. and 11:00 p.m., and gets out of bed between 3:30 a.m. and 5:30 a.m. In the morning, he eats breakfast, and then he watches television until lunchtime. He then decides what he will have for lunch. He might prepare noodles at home, or he might go to the store and get a pizza. Before eating his lunch, he will check his blood sugar. In the afternoon, he again watches television, and sometimes he takes a short walk "if it's not too hot." He used to build models, work on his car, and go for long walks, but at the time of the ALJ hearing, he no longer had any hobbies. (R. 356-57)

### 2.    *Closson's medical history*

Closson was injured at work on May 23, 2003, when "he lost his balance, slipped and had [his] neck thrown back. Over the next couple of days he developed spasticity in the limbs." (R. 163, 186) Thomas J. Clark, D.O. evaluated Closson on July 22, 2003, for his lower limb spasticity. At that time, Closson "had weakness in the hand intrinsic muscles of both hands with paresthesias in the fourth and fifth fingers, hyperreflexia and spasticity in the lower limbs and loss of proprioception." (R. 163) An MRI showed "severe spinal stenosis and cord compression at C3-4, C4-5, C5-6 and C6-7[.]" Dr. Clark consulted with a neurosurgeon, who felt Closson "had a cord injury related to the work injury and suggested a decompression of the spinal cord." (*Id.*) The doctors attempted to obtain Worker's Compensation approval for the surgery, but Closson's employer, the

City of Sioux City, had an independent physician review the case, and based on that physician's assessment, the City took the position that Closson's work injury was not causing his current symptoms. (*Id.*)

Closson was referred for an evaluation in Iowa City at the end of August 2003, but the evaluation did not take place. Instead, Closson returned to see Dr. Clark on August 14, 2003, complaining of continued "difficulty with weakness in the hands and spasticity in the lower limbs." (*Id.*) Clossen was having increasing difficulty walking and could "barely get around." (R. 186) In addition, Closson felt the muscles in his arms and legs were getting smaller. (*Id.*) Dr. Clark admitted Closson to the hospital and requested a second neurosurgical evaluation. He indicated Clossen needed "to have his spinal cord decompressed to avoid further injury or to lessen the chan[c]e that his current symptoms will be permanent." (R. 163)

Clossen was evaluated by neurosurgeon Quentin J. Durward, M.D., who felt the "surgical decompression should not wait." (*Id.*) Dr. Durward reviewed the MRI and noted it showed four disk herniations in Closson's neck, each of which produced cord compression. The worst herniation was at about the C4-5-6 level, where signal change within the cord was noted. The doctor found the degree of compression to be severe. (R. 181) Examination notes made by Kristi D. Walz, M.D. indicate Closson would "have limited motion of his neck after the surgery," but without the surgery, he could "wind up in a wheelchair." (R. 184)

On August 16, 2004, Closson underwent "[a]nterior C3-4, C4-5, C5-6, C6-7 microsurgical diskectomies with spinal cord decompression, allograft Smith-Robinson fusion C3-4, C4-5, C5-6 and C6-7 with augmented local harvest autograft bone, anterior plate stabilization C3, C4, C5, C6, C7 (Atlantis system)." (R. 179) Closson experienced respiratory failure following the surgery and was maintained on a ventilator for about a day. After he was taken off the ventilator and extubated, he complained of neck pain

(which the doctor indicated was to be expected), hoarseness, mild difficulty speaking, and dysphagia. He was referred for physical therapy, occupational therapy, and speech therapy, with a short course of inpatient rehabilitation. (*See* R. 171-75) He was discharged from the hospital to the rehab unit on August 23, 2003. (R. 169)

On August 26, 2003, Closson was seen by a speech therapist (a medical doctor), who assessed him with "[t]rue vocal cord paralysis on the right." (R. 201) Because Closson was in a cervical collar, some medical therapies would have been difficult, so the doctor elected to delay speech therapy for one month to see if Closson's condition improved. (R. 200-01) By August 29, 2003, Closson had "completed a comprehensive inpatient rehabilitation program" and had "made some very nice progress." (R. 197) He required minimal assistance and supervision for most self-care activities, and he required a walker to walk. (R. 197-98) He was discharged to home, with several follow-up visits scheduled with his doctors. He was directed to wear a hard cervical collar at all times, and to attend outpatient physical and speech therapy three times weekly. (*Id.*)

On November 14, 2003, Dennis A. Weis, M.D. reviewed the record and completed a physical residual functional capacity assessment form concerning Closson. (R. 229-38) Among other things, Dr. Weis indicated Closson could perform most postural activities occasionally, and although he should avoid concentrated exposure to heights, he otherwise would have no environmental limitations. From the doctor's narrative summary (R. 229-30), it is obvious his review was performed prior to Closson's surgery. As such, the court finds the assessment to be of no value in the disability determination.[2]

---

[2]The court also finds it incredible that another consultant, J.D. Wilson, M.D., allegedly reviewed "all the evidence in file" on March 3, 2004, in connection with Closson's reconsideration claim, and affirmed Dr. Weis's assessment "as written." (*See* R. 238) In his narrative summary, Dr. Wilson indicated Closson had "sought additional treatment since his initial claim," but he mentions nothing about Closson's surgery or the physical limitations that likely would result from the surgery. (*See* R. 267)

On March 19, 2004, Dr. Durward wrote a note indicating Closson "remains disabled from his cervical disc problems." (R. 239) Dr. Durward opined Closson "should qualify for Social Security." (*Id.*)

Closson saw Dr. Durward for follow-up on October 6, 2003. Closson was "doing extremely well," and felt he had regained his strength in his upper and lower extremities, although he was "still a bit wobbly on his feet." (R. 241) He still remained somewhat hoarse. Examination revealed that Closson's hand strength was somewhat weak, at 4.4/5 on the left and 4.2/5 on the right. Closson was directed to remain in the full brace for another three weeks, and then move into a Philadelphia collar, a slightly less-restrictive neck brace that still would allow only very limited neck movement.[3]

Closson returned for follow-up on November 17, 2003. He continued to do extremely well and stated he was "back to normal." He continued to have "a stiff feeling in his knees, left slightly more than right." (R. 240) Notes indicate his upper extremity power, including his hand intrinsics, was completely normal. His lower extremity power also was normal, although he continued to walk "with a very mild spastic gait affecting his left leg." (*Id.*) The doctor allowed Closson to stop using the Philadelphia collar. The doctor opined, "He does qualify for disability, and I believe he has that. I think, however, if there is some kind of self employment that he could do with lifting restrictions in the long term that would be of value to him." (*Id.*)

Closson saw his family doctor on December 3, 2003, for follow-up of his hypertension and diabetes. He complained of some continued pain in his neck, as well as numbness and weakness in his lower extremities. He was not checking his blood sugar regularly due to lack of funds. Closson stated he felt there were no jobs he could do because of his inability to read and write. The doctor encouraged Closson "to go to Job

---

[3] *See* http://www.upstate.edu/uhpated/pdf/ortho/philly_aspen_miami_j_collar.pdf (01-15-08) for drawings and a description of the Philadelphia collar.

Service to see if he can get retrained in something else," noting Closson had expressed interest in truck driving at one point. (R. 247)

Closson saw Dr. Durward for follow-up on March 19, 2004. He reported "feeling far better than he did before surgery." (R. 284) He still complained of some occasional numbing of his left index finger; significantly restricted motion of his neck, but without pain; and a slight catching in his legs at times. On examination, Closson demonstrated "about a 50% reduction of motion of his neck in all directions." (*Id.*) He continued to have "slight weakness of his hand intrinsics, left more than right," and his gait showed "very minimal evidence of a mild spasticity." (*Id.*) Dr. Durward indicated Closson had done extremely well, but he nevertheless was "very reluctant to recommend that he go back to any type of physical work because . . . it is going to stress above and below the fusion and lead to more problems down the line." (*Id.*) He opined Closson would "qualify as being disabled" due to his limited education. (*Id.*)

On March 21, 2005, Dr. Durward saw Closson for follow-up.[4] Closson reported he still had to catch himself occasionally because of loss of balance, and he experienced leg shaking when he was in a squat and tried to rise. He had some numbness of his left index finger, and occasional stiffness in his neck, which still evidenced a 50% decrease in range of motion. His gait appeared normal. Dr. Durward recommended Closson lift "at absolute max 25 pounds, frequent 15 pounds, avoid working with his arms above his neck, avoid production work where his head is frequently turning or bending forwards and backwards." (R. 289) He opined that with Closson's education level, he would be disabled "unless some kind of light job with job retraining can be found," about which he expressed doubt. (*Id.*)

---

[4]Dr. Durward noted it had "been about nine months" since Closson's back surgery, an obvious error given that Closson's surgery was about one year and nine months earlier. (*See* R. 289)

On April 27, 2005, Closson returned to see Dr. Clark for an assessment of his current condition. (R. 278-80) He had not seen Dr. Clark for nearly two years. (R. 279) Closson reported ongoing trouble with balance, persistent numbness in his left index finger, and intermittent weakness in his legs with activity. However, he stated he felt significantly better overall. (*Id.*) Following his physical examination of Closson, Dr. Clark opined Closson "has severe permanent injury with neurologic compromise," and he therefore should not perform any type of heavy work or any significant physical work. He recommended Closson not lift more than ten pounds occasionally, and he should avoid reaching, stooping, lifting, and bending. (R. 280)

On June 7, 2005, Closson underwent a psychodiagnostic mental status evaluation and testing at the request of the state disability examiner. (R. 272-76) As part of the evaluation, Closson described his daily activities, as follows:

> Mr. Closson lives alone. He normally goes to bed about 10:00 PM and wakes about 4:30 AM with reportedly good sleep and good sleep onset. During the day he does chores of vacuuming, dishes, housekeeping. He helps his landlord out by driving and picking up the landlord[']s coworkers though this is not for pay. He does his own grocery shipping. Has a driver's licence. He does his own finances. He does nothing for fun because "he has no money." He watches some TV but adds "I have no cable". He reports doing nothing else socially.
>
> Mr. Closson states that he does the chores carefully because "I have to watch my walking and my balance to make sure I do not fall and injure myself". He therefore, for instance sits in the shower. He does not use the stove. He reports not being able to bend very long or else his legs will shake. He reports not having much pain presently except for tingling in his left index finger.

(R. 273) The evaluator noted Closson walked somewhat slowly, but otherwise demonstrated no obvious posturing or movement difficulties. (*Id.*)

Closson was unable to add by threes, nor could he conduct serial sevens, even after repeated tries. He could list four of the states around Iowa, and could name four of the last six Presidents. He was unable to interpret proverbs accurately, or do any arithmetic calculations. (R. 273-74) He reported feeling worthless, upset, and mad about the things he no longer was able to do, and he expressed some "fear of falling now and ending up in a wheelchair." (R. 274)

The evaluator noted Closson was very cooperative and appeared to put forth his best effort on the testing, which was considered to be valid. (R. 274) Closson achieved a Verbal IQ of 76, Performance IQ of 78, and Full Scale IQ of 75. He displayed significant weakness in several areas. He was able to read at a second-grade level, spell at a first-grade level, and do arithmetic at a second-grade level, all of which the evaluator noted to be "extremely poor academic achievement." (*Id.*)

The evaluator reached the following conclusions regarding Closson's work-related mental limitations:

> Mr. Closson states that he takes care of his own finances and shopping. He has reportedly lived and functioned independently in the past. He has very poor abilities for handling cash benefits, even though he reports doing so in the past. Perhaps for simple transactions he does adequately, but could use supervision in most financial areas of handling cash benefits.

> In regards to mental limitations related to work activities, remembering and understanding instructions, procedures, and locations would be a primary problem. He is of borderline intellectual functioning and is basically illiterate for reading and writing abilities. Instructions given verbally of a fairly simple nature consistent of past janitorial work may not be problematic. He does not present a work history suggestive of inappropriate interactions. He interacted well during the evaluation and could be expected to do so with supervisors, coworkers, and the public.

(*Id.*)

### 3. *Vocational expert's testimony*

VE George Brian Paprocki prepared a summary of Closson's past relevant work that included hospital cleaner, bottling line attendant, hand packager, groundskeeper, machine packager, warehouse worker, and salvage laborer. (*See* R. 157-58) The ALJ asked the VE the following hypothetical question:

> My first assumption is that we have an individual who is 46 years old, who was 44 years old as of the alleged onset date of disability. He's a male. He has a high school -- he completed high school in Special Education, and he has past relevant work, as you've indicated in [the summary]. And he has the following impairments. He has status post decompression and fusion on the 3rd through 7th cervical level. Type II diabetes [mellitus], hypertension, and adjustment disorder not otherwise specified. A learning disorder, not otherwise specified, and borderline intellectual functioning, and as a result of a combination of those impairments he has the residual functional capacity as follows. He cannot lift more than 20 pounds. Routinely lift 10 pounds with standing, or walking of two hours out of an eight-our day. Sitting of six hours out of an eight-hour day with only occasional squatting, or climbing. No continuous operation of foot controls. This individual should not work at unprotected heights, or around hazardous moving machinery. He should not walk on uneven ground. He is able to do simple, routine, repetitive work that does not rely on written material, or mathematical calculations, and does not require constant, close attention to detail, or use of independent judgment for decision-making. He does require occasional supervision, and he should not work at more than a regular pace, and that's using three speeds of pace being fast, regular, and slow. Would this individual be able to perform any job he previously worked at, either as he performed it, or as it is generally performed within the national economy?

(R. 364-65)

The VE indicated the hypothetical individual would not be able to perform Closson's past relevant work, but he would be capable of performing a wide range of sedentary work that did not involve reading or math. Examples of jobs the individual could perform included fishing reel assembler; lampshade assembler; and production inspector, checker, or examiner, such as dowel inspector in the woodworking industry, or a button reclaimer or inspector. (R. 365-67)

The ALJ then asked the VE the following question:

> My next hypothetical would be an individual of the same age, and sex, education, past relevant work, and impairments as previously specified, and this would be an individual who'd have the residual functional capacity as follows. He could lift less than 20 pounds, routinely lift 10 pounds with standing of 40 minutes at a time, and sitting of 20 minutes at a time, and walking of four to five blocks at a time with only occasional bending, stooping, twisting of the neck, squatting, kneeling, crawling, or climbing. Only occasional pushing, or pulling, or occasional use of the hands for very fine manipulation. Only occasional work with the arms overhead. This individual should not be exposed to excessive heat, humidity, or cold. He should not work at unprotected heights, or around hazardous moving machinery, and he should avoid walking on uneven ground. He is able to do only simple, routine, repetitive work that does not rely on written material, or mathematical computations, and does not require constant close attention to detail, or use of independent judgment for decision-making. He – this individual would require close supervision, and by close supervision I mean that he needs a supervisor on site, but not necessarily looking over his shoulder. He should not work at more than a regular pace, or more than a moderate level of stress. I assume this individual cannot return to past relevant work, would that be correct?

(R. 367) The VE responded, "Yes." (R. 368)

The ALJ then asked, "Within the perimeters [sic] of this hypothetical, would the claimant be able to perform the full, and or wide range of unskilled work?" The VE responded:

> Well, again, you're talking about less than a – even a wide range of activities with the limitations on use of academics to do the job. I would think that a number of the jobs I mentioned in response to the first hypothetical, primarily the assembly jobs of a sedentary nature may be feasible. I think I'd reduce the number I gave you probably by half due to the need for the frequency of positional change between sitting and standing that you suggest. Many of those jobs do allow good latitude for change of position, but not all of them, and I don't believe all of them would allow change at the frequency we're talking about here.

*Id*.

In response to a question from Closson's attorney, the VE admitted he was not considering any possible risk that these jobs might result in further injury to Closson's back. (R. 369) Closson's attorney then asked the VE the following question:

> And if you added those additional considerations into the second hypothetical, and if we . . . adjust the restrictions so that they incorporate the treating neurologist restrictions as well as evidenced in his report dated 4/27/05 where Dr. Clark says specifically he should not be lifting any more than 10 pounds on an intermittent basis, reaching, stooping, lifting, and bending all should be avoided. We include Dr. Clark's restriction as such, along with Dr. Derwood's [sic] recommendation and restriction in his examination report of March 19, 2004 where he states, "I'm very reluctant to recommend that he go back to any type of physical work, because I think it's going to stress above and below the fusion, and lead to more problems down the line." If we consider those two restrictions, and of course incorporate the mental limitations as found by the psychologist, Dr. Baker, in his reported [sic] [of]

> June 7 of 2005. Would that further reduce the number of jobs available to Mr. Clossen?

(R. 369-70)

The VE replied:

> The need to do . . . no more than occasional bending, stooping, or lifting more than 10 pounds, that group of limitations is not going to prevent the work I indicated, because it is sedentary activity, which would require little, if any, bending and stooping, because the majority of time is spent in a sitting posture, and 10 pounds as a maximum that would be normally allowed in the sedentary work activity. If you assume, on the other hand that any work activity is going to prevent employment this is of course what we're talking about here, employment would not be feasible. . . . [T]he type of work that I've specified here really is the lowest of entry-level type activities. You're only talking about a few steps, and repeating it pretty much endlessly, so if you could do any type of work from a mental standpoint, and intellectual standpoint it certainly would be this type work. I mean it's unskilled work. As activity we talk about being learned within 30 days. Any of the jobs I mentioned would certainly be less than the 30 days, so I wouldn't consider those significant.

(R. 370-71)

The VE acknowledged that if the treating neurologist's recommendation is interpreted to mean Closson is unable to do any stooping, lifting, or bending whatsoever, then he would be unable to do any type of competitive work. (R. 372-73)


4. ***The ALJ's decision***

The ALJ found Closson has not engaged in substantial gainful activity at any time since his alleged onset date of May 23, 2003. He found Closson to have the following impairments which, in combination, are severe: "status post decompression and fusion at C3-7, type II diabetes mellitus, hypertension, adjustment disorder, not otherwise specified

17

(NOS)[,] learning disability NOS and borderline intellectual functioning." (R. 16) However, the ALJ further found Closson's impairments do not meet or equal the the criteria of any of the Listings. (*Id.*) In particular, he found Closson's mental impairments do not meet Listings §§ 12.02 or 12.04. (*Id.*; *see also* R. 19)

The ALJ found Closson's mental impairments result in the following limitations in his functioning: "mild restriction of his activities of daily living; no restrictions in maintaining social functioning; moderate restrictions in maintaining concentration, persistence or pace; and . . . no episodes of decompensation." (R. 16-17)

The ALJ found Closson's subjective complaints not to be entirely credible. Despite Closson's claim that he is totally disabled, he takes no pain medications, is able to perform self care without assistance, does some housework, and requires no regular medical care other than routine monitoring of his diabetes, blood pressure, and cholesterol, all of which are under good control with medications. (R. 20) The ALJ noted that although Closson believes he is unable to work due to his inability to read and write, he maintained successful employment prior to his injury. (*Id.*)

The ALJ found Dena Wise's testimony that Closson's mental capacity worsened after his surgery not to be fully credible. The ALJ gave no reason for discounting Ms. Wise's testimony, stating only that her testimony "does not indicate total disability." (*Id.*)

The ALJ found Closson retains the residual functional capacity to lift twenty to twenty-five pounds occasionally and ten to fifteen pounds repeatedly; stand/walk for two hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally squat, climb, bend, stoop, twist his neck, and use his arms overhead. He found Closson could not use foot controls excessively, and he should avoid working at unprotected heights or around dangerous machinery, and walking on uneven ground. The ALJ noted Closson would need supervision occasionally, but otherwise he can work at a regular pace

performing "simple, routine, repetitive work with no requirements for the use of written material or mathematical calculations, constant close attention to detail or the use of independent judgment for decision making." (*Id.*)

Relying on the VE's testimony, the ALJ found Closson is unable to return to any of his past relevant work, but even if he is required to change positions frequently, he still retains the capacity to perform a number of sedentary, unskilled jobs, including assembler of fishing reels or lamp shades, and production inspector. (R. 21) Therefore, the ALJ concluded Closson is not disabled. (*Id.*)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the

claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving

Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221

F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1)     the claimant's daily activities;
2)     the duration, frequency and intensity of the pain;
3)     precipitating and aggravating factors;
4)     dosage, effectiveness and side effects of medication;
5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Closson argues he is presumptively disabled because his condition "equals" the criteria of Listing § 12.05C, for mental retardation. (Doc. No. 11 at 12-17) To be disabled under Listing § 12.05C, a claimant must meet the following criteria:

> *12.05 Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied:
>
> .  .  .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C.

Closson argues the ALJ erred in failing to consider Listing § 12.05C. He argues the ALJ's general discussion at step three of the evaluation process, and his failure to discuss Listing § 12.05C, placed the disposition of this case under the guidance of *Chunn*

*v. Barnhart*, 397 F.3d 667, 671 (8th Cir. 2005). The court find *Chunn* to be distinguishable on its facts. Chunn had a psychological assessment that demonstrated her verbal IQ to be 54, performance IQ to be 48, and full scale IQ to be 46. *See id.*, 397 F.2d at 669. The evaluator found Chunn lacked motivation and opined that her scores likely underestimated her abilities, but the evaluator nevertheless indicated Chunn's IQ fell "within the moderate retardation range." *Id.* The court held the ALJ erred in failing to "explicitly reject the psychologist's opinion, much less explain why her opinion should not be relied on." *Id.*, 397 F.2d at 672.

In the present case, all of Closson's IQ scores fall above the range listed in the regulation. Closson recognizes this distinction, and acknowledges he therefore does not "meet" the Listing requirements, but he argues he "equals" the Listing requirements, "based upon the five point margin of error inherent in the WAIS-III testing." (Doc. No. 11 at 13, citing *Walker v. Massanari*, 149 F. Supp. 2d 843, 847 (S.D. Iowa 2001), noting the *Walker* court declined to apply the five-point margin of error). This court is not persuaded. Closson's work history and ability to live and function independently for most of his life contradicts his assertion that he had significant limitations in his adaptive functioning prior to age 22.[5] As the Commissioner notes in his brief, the Supreme Court has recognized that the standards to meet the Listing levels of severity are "higher . . . than the statutory standard. The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S. Ct. 885, 892, 107 L. Ed. 2d 967 (1990) (citing 20 C.F.R. § 416.925(a) (1989)) (emphasis by

---

[5]In his reply brief, Closson argues "[t]he ability to work at a number of jobs for many years is not inconsistent with disability under listing § 12.05C." (Doc. No. 15 at 2, citing *Sird v. Chater*, 105 F.3d 401, 402 (8th Cir. 1997)). The court's conclusion does not contradict this argument. Rather, the court finds Closson's ability to live independently, support himself, and care for himself prior to his accident demonstrates he did not have significant deficits in his adaptive functioning that manifested initially before age 22, as required by the regulation.

the Court). The reason for this extremely high level of severity is to allow for a presumption of disability in particularly severe cases that renders further inquiry unnecessary. *Id.* The court finds the record contains substantial evidence to support the ALJ's conclusion that Closson's mental impairment does not meet or equal Listing level. The court further finds it was not reversible error for the ALJ not to discuss Listing § 12.05C specifically. *See Pepper v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) ("Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion, as it does in this case.") (citations omitted).

Closson next argues that considering the VE's testimony limiting him to sedentary work, his illiteracy, and his history of unskilled work, he was disabled as of his 45th birthday pursuant to Vocational Rule 201.17. (Doc. No. 11 at 17-21) The vocational rule upon which Closson relies is part of the medical-vocational guidelines or "grids" codified at 20 C.F.R. Part 404, Sub-Part P, Appendix 2, Section 201.17.

> [T]he medical-vocational guidelines or 'grids,' . . . are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. *See Foreman v. Callahan*, 122 F.3d 24, 25 (8th Cir. 1997). Reliance on the grids is "'predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs' and therefore 'may not be fully applicable where the nature of an individual's impairment does not result in such limitations,'" namely, mental impairments and pain. *Id.* (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)). Thus, if a claimant's ability to perform the full range of work in a particular category is limited by a nonexertional impairment, the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony. *See Frankl*, 47 F.3d at 937.

*Beckley v. Apfel*, 152 F.3d 1056, 1069 (8th Cir. 1998). *See Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2001) (when a claimant has nonexertional impairments, use of the "grids" is inappropriate) (citing *Beckley*). In this case, Closson's impairments include mental impairments, which would preclude the ALJ from relying solely on the grids. However, if the grids would direct a finding that Closson is disabled regardless of his mental impairments, then the grids should be applied. *See Anschutz v. Barnhart*, 212 F. Supp. 2d 1077, 1085 (S.D. Iowa 2002) ("Where, however, the claimant also suffers from a non-exertional impairment which causes the claimant's relevant characteristics to differ in any material respect from those characteristics contemplated by the Guidelines, the Guidelines may not be applied unless the Guidelines direct a finding of disabled.")

Under the grids, individuals age 45 to 49 are disabled if they:

> (i)  Are restricted to sedentary work,
> (ii)  Are unskilled or have no transferable skills,
> (iii)  Have no past relevant work or can no longer perform past relevant work, and
> (iv)  Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(h)(1). The VE limited Closson to sedentary work, and indicated he has no transferable skills, meeting the first two criteria. The ALJ acknowledged that based on the medical evidence and the VE's testimony, Closson is unable to perform any of his past relevant work, meeting the third criterion. Because Closson clearly is able to speak and understand English, the issue remaining is whether Closson is "unable to read or write in English." Closson does not meet this criterion. Closson was found to read at a second-grade level and spell at a first-grade level. (R. 274) Although his skills are markedly deficient, he nevertheless is able to read and write in English. He was able to attend technical courses after high school, and he made Cs in

many of his courses. (*See* R. 155) The record demonstrates that Closson is not "unable to read or write in English."

Closson next argues the ALJ erred in failing to give "good reasons" for discounting the opinions of his treating physicians regarding his ability to move his neck. (Doc. No. 11 at 22-24) He argues the ALJ failed to include in the hypothetical questions to the VE any limitations regarding his ability to move his neck. Dr. Durward opined Closson should "avoid working with his arms above his neck, [and] avoid production work where his head is frequently turning or bending forwards and backwards." (R. 289) Dr. Clark further indicated Closson should avoid reaching. (R. 280) In the ALJ's second hypothetical question to the VE, he included limitations that the individual be limited to "only occasional . . . twisting of the neck," and "[o]nly occasional work with the arms overhead." (R. 367) The ALJ included these same limitations in his ultimate residual functional capacity assessment. (*See* R. 20) Based on those limitations, the VE found Closson could perform "assembly jobs of a sedentary nature," giving examples of fishing reel assembler and lampshade assembler. (*See* R. 365-68) The court finds the ALJ did not "discount" the opinions of Drs. Durward and Clark.

Closson further argues the ALJ discounted the opinion of Dr. Kristi Walz. Dr. Walz examined Closson prior to his surgery. She noted he would "have limited motion of his neck after the surgery[.]" (R. 184) The limitations the ALJ found Closson to have are not inconsistent with Dr. Walz's opinion.

Closson also argues the ALJ erred in failing to "to ascertain whether there were any inconsistencies between the Vocational Expert's testimony and the Dictionary of Occupational Titles." (Doc. No. 11 at 24; *see id.* at 24-27) Closson relies on SSR 00-4p, which places on an ALJ "an affirmative responsibility to ask about any possible conflict" between evidence provided by a VE and information provided in the Dictionary of Occupational Titles ("DOT"). He argues such an inquiry was crucial in this case because,

in his view, every one of the jobs the VE indicated he could perform contains requirements that are outside the parameters of his functional abilities.

The Commissioner places the onus on Closson's counsel, who declined to request "a more detailed enumeration of all of the vocational expert's resource materials." (Doc. No. 14 at 24) At the hearing, the following colloquy took place between the ALJ, the VE, and Closson's counsel, Dennis McElwain:

> ALJ: In your work in general, and on this case in particular, do you make reference to any books, or studies to assist you in making assessments as to the characteristics of various jobs in the economy, and the work of past [sic] to people who may come before you?

> VE: Yes.

> ALJ: Are you also aware [of] approximately 2,500 jobs requiring sedentary, light, medium exertion, which do not require skills, or previous work experience, which have been administratively noticed, and the reference material upon which that notice is based?

> VE: I am.

> ALJ: Are those materials similar to those, which you utilize in your practice?

> VE: They are exactly the same.

> ALJ: Mr. McElwain, would you like Mr. Paprocki to enumerate those reference materials?

> ATTY: No, Your Honor.

(R. 361-62) The VE prepared a chart describing Closson's past work activity. (*See* R. 157-58) The ALJ asked the VE, "Upon what sources, did you rely in completing this chart?" The VE responded, "This is based on my review of the documentary evidence in the file, the testimony here today, and the use of the Dictionary of Occupational Titles." (R. 363)

Closson does not argue the ALJ should have obtained "a more detailed enumeration of all of the vocational expert's resource materials," nor would such a recitation have resolved the issue Closson raises here. Rather, he argues the ALJ failed in his duty to resolve conflicts between the VE's evidence and the information provided in the DOT, as required by SSR 00-4p. The Commissioner argues any discrepancies "are not between the vocational expert testimony and the <u>DOT</u>, but between [Closson's] subjective allegations and the <u>DOT</u>." (Doc. No. 14 at 24) The Commissioner's argument is not supported by the evidence.

In the ALJ's residual functional capacity assessment, he found, among other things, that Closson could perform "simple, routine, repetitive work with no requirements for the use of written material or mathematical calculations, constant close attention to detail or the use of independent judgment for decision making." (R. 20) Each of the jobs the VE gave as examples of work Closson could perform requires skills beyond these abilities. The jobs of Dowel Inspector, Button Reclaimer, and Lamp-Shade Assembler, all cited by the VE, require the following:

> **Math:** Level 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

> **Language:** Level 1 - READING: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

> WRITING: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

DOT 669.687-014, DOT 734.687-042, DOT 739.684-094. These requirements do not meet Closson's limitations as determined by the ALJ. In addition, the Lamp-Shade Assembler position requires the application of "commonsense understanding to carry out

detailed but uninvolved written or oral instructions." DOT 739.684-094. Again, this requirement is beyond Closson's capabilities as found by the ALJ.

The job of Fishing-Rod Assembler requires the following:

> **Math:** Level 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

> **Language:** Level 2 - READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

> WRITING: Write compound and complex sentences, using cursive style, proper end punc[t]uation, and employing adjectives and adverbs.

DOC 732.684-066. Further, the Fishing-Rod Assembler position includes physical demand requirements that "are in excess of those for Sedentary Work." *Id.* Again, these requirements are in excess of Closson's limitations as determined by the ALJ.

The ALJ erred in failing to resolve the conflict between the VE's testimony and the ALJ's findings regarding Closson's residual functional capacity. Furthermore, the court finds the conflict is incapable of resolution. As illustrated by the above descriptions, the DOT descriptions of the requirements for various jobs include, among other things, certain defined levels of general education development ("GED").

> General Education Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

> The GED Scale is composed of three divisions: Reasoning
> Development, Mathematical Development, and Language
> Development. The description of the various levels of
> language and mathematical development are based on the
> curricula taught in school throughout the United States. An
> analysis of mathematics courses in school curricula reveals
> distinct levels of progression in the primary and secondary
> grades and in college. These levels of progression facilitated
> the selection and assignment of six levels of GED for the
> mathematical development scale. . . . [L]anguage
> development is limited to five defined levels of GED. . . ."

DOT App. C (4th ed., rev. 1991), 1991 WL 688702 (G.P.O.).

The *lowest level* of mathematical and language development is Level 1; there is no
"Level 0." *See id.* The ALJ's assessment of Closson's abilities recognizes that he is
unable to perform work that requires "the use of written material or mathematical
calculations." (R. 20) The lowest level of mathematical development for any job listed
in the DOT includes a requirement that the worker be able to "[m]ultiply and divide 10's
and 100's by 2, 3, 4, 5 . . . [and] [p]erform operations with units such as cup, pint, and
quart; inch, foot, and yard; and ounce and pound." Closson has not demonstrated the
ability to perform this level of mathematical calculation. As a result, despite Closson's
ability to do simple addition and subtraction if he has a scratch pad or calculator, and his
ability to make change for a dollar if he counts it out, Closson would be unable to perform
*any* job listed in the DOT.

Because the ALJ found Closson could not return to any of his past relevant work,
the burden shifted to the Commissioner to show both that Closson's residual functional
capacity would allow him to make an adjustment to other work, and that the other work
exists in significant numbers in the national economy. Clarification of Rules, etc., *supra*,
68 Fed. Reg. at 51,155; 20 C.F.R. § 404.1520(4)(v); *Dixon v. Barnhart*, 353 F.3d 602,
605 (8th Cir. 2003); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Nevland*

*v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner failed to meet his burden to show there are jobs in the economy that Closson can perform. The VE's testimony that Closson could be employed in the positions the VE listed, given Closson's level of education, conflicts with the DOT. "When expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls." *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997) (citing *Montgomery v. Chater*, 69 F.3d 273, 276 (8th Cir. 1995)). Consequently, the VE's testimony cannot constitute substantial evidence to support the ALJ's assertion that Closson can perform other jobs in the national economy. *Id.*

The court may affirm, modify, or reverse the Commissioner's decision with or without remand for rehearing. 42 U.S.C. § 405(g). When the record "overwhelmingly supports" a finding of disability, and further proceedings would merely delay the receipt of benefits to which a claimant is entitled, the court should enter an immediate finding of disability. *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (citing *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992); *Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir. 1989); *Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir. 1987)); *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991) (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Ingram v. Barnhart*, 303 F.3d 890, 895 (8th Cir. 2002) (citing *Buckner*); *Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998).

In this case, the court finds the record overwhelmingly supports a finding that Closson is unable to perform any work that exists in the national economy, and he therefore is disabled.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[6] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed, judgment be entered for Closson, and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for a finding of disability and for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 18th day of January, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[6]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.